**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JOSEPH BRUNO, derivatively on behalf of CROWN CASTLE INTERNATIONAL CORP., <br><br> Plaintiff, <br><br> vs. <br><br> JAY A. BROWN, DANIEL K. SCHLANGER, P. ROBERT BARTOLO, CINDY CHRISTY, ARI Q. FITZGERALD, ROBERT E. GARRISON II, ANDREA J. GOLDSMITH, LEE W. HOGAN, EDWARD C. HUTCHESON, JR., J. LANDIS MARTIN, ROBERT F. MCKENZIE, ANTHIBY J. MELONE, and W. BENJAMIN MORELAND, <br><br> Defendants, <br><br> and <br><br> CROWN CASTLE INTERNATIONAL CORP., <br><br> Nominal Defendant. | Case No.: |

**SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Joseph Bruno ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Crown Castle International Corp. ("Crown Castle" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Jay A. Brown, Daniel K. Schlanger, P. Robert Bartolo, Cindy Christy, Ari Q. Fitzgerald, Robert E. Garrison II, Andrea J. Goldsmith, Lee W. Hogan, Edward C. Hutcheson, Jr., J. Landis Martin, Robert F. McKenzie, Anthony J. Melone, and W. Benjamin Moreland (collectively, the "Individual Defendants" and together with Crown Castle, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Crown Castle, unjust enrichment, abuse of control,

gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Crown Castle, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Crown Castle's directors and officers from February 26, 2018 through the present (the "Relevant Period").

2.     Crown Castle is a Houston, Texas-based real estate investment trust ("REIT") that owns, operates, and leases communications infrastructure across the United States. The Company's assets include approximately 40,000 cell towers and over 65,000 miles of fiber optic cable, which are managed by the Company's Towers segment and Fiber segment, respectively.

3.     Under applicable SEC rules and regulations, public companies, such as Crown Castle, are required to file financial statements that are prepared in accordance with generally accepted accounting principles ("GAAP"). Financial statements that are not in compliance with GAAP are presumed misleading by the SEC.

4.      Throughout the Relevant Period, the Individual Defendants caused the Company to improperly record in its financial statements certain services revenues generated by the Company's cell tower installation services. Specifically, the Company recorded the entirety of the transaction price from its installation services as revenue upon the completion of such services, despite the fact that portions of these transaction prices constituted modifications to leases, and therefore should have been recognized over the course of the lease terms. As such, each of the Company's financial statements filed during the Relevant Period were not in compliance with GAAP.

5.      In September 2019, the SEC issued a subpoena to the Company, requesting certain documents relating to the Company's service business. Subsequently, the Company and its independent auditor consulted with the SEC's Office of the Chief Accountant ("OCA") regarding the Company's revenue recognition policies.

6.      On February 26, 2020, the Company issued a press release revealing that the OCA and the Company had determined that the Company's "long-standing historical practice" with respect to recognizing revenue from its cell tower installation services was indeed unacceptable under GAAP, which indicated the existence of a material weakness in the Company's internal controls over financial reporting. As such, the Company would be forced to reduce its adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA"), its adjusted funds from operations, and its net income by approximately $100 million, each, for the fiscal year ended December 31, 2019. Additionally, the Company disclosed that it would need to restate each of its financial statements filed with the SEC during the fiscal years ended December 31, 2018 and December 31, 2019.

7.      On this news, the Company's stock price fell by over 8.8%, from $162.69 per share at the close of trading on February 26, 2020, to $148.40 per share at the close of trading on February 27, 2020.

8.      As a result of the material weaknesses in the Company's internal controls, on March 2, 2020, the Company notified the SEC that it would be unable to timely file its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K").

9.      During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

10.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain services revenues in its financial statements, in violation of GAAP; (2) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (3) as a result of the foregoing, the Company would be subject to increased scrutiny from the SEC, culminating in an investigation, the need to restate certain of the Company's financial statements, and other damages to the Company; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, Crown Castle's public statements were materially false and misleading at all relevant times.

11.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions

of material fact, while one of the Individual Defendants made a lucrative insider sale, netting proceeds of over $279,311.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls, and to fail to timely file the Company's 2019 10-K.

13.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), and the Company's Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and is costing the Company millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act of 1933 and the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because Crown Castle is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Crown Castle. Plaintiff has continuously held Crown Castle common stock at all relevant times.

### Nominal Defendant Crown Castle

21.     Crown Castle is a Delaware corporation with its principal executive offices at 1220 Augusta Drive, Suite 600, Houston, Texas 77057-2261. Crown Castle's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CCI."

**Defendant Brown**

22.    Defendant Jay A. Brown ("Brown") has served as the Company's CEO and President since June 2016. Previously, he served as the Company's Senior Vice President, CFO, and Treasurer from July 2008 to May 2016. According to the Company's Schedule 14A filed with the SEC on April 1, 2019 (the "2019 Proxy Statement), as of March 29, 2019, Defendant Brown beneficially owned 199,256 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Brown owned approximately $25.5 million worth of Crown Castle stock.

23.    For the fiscal year ended December 31, 2018, Defendant Brown received $9,025,526 in compensation from the Company. This included $905,769 in salary, $6,361,135 in stock awards, $1,707,772 in non-equity incentive plan compensation, and $50,850 in all other compensation.

24.    The 2019 Proxy Statement stated the following about Defendant Brown:

Mr. Brown was elected to the Board as a director in May 2016 and has served as our President and CEO effective June 2016. Previously, Mr. Brown served as our Senior Vice President ("SVP"), Chief Financial Officer ("CFO") and Treasurer from July 2008 to May 2016. Mr. Brown served as Vice President of Finance from August 2001 until his appointment as our CFO and, during such time, was also appointed Treasurer in May 2004. From the time he joined the Company in August 1999 until July 2001, Mr. Brown served in a number of positions in corporate development and corporate finance. Mr. Brown serves on the advisory board of governors of NAREIT—the National Association of Real Estate Investment Trusts, the board of directors and executive committee of the Wireless Industry Association and the advisory board of Hankamer School of Business at Baylor University.

**Defendant Schlanger**

25.    Defendant Daniel K. Schlanger ("Schlanger") has served as the Company's Senior Vice President and CFO since June 2016. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Schlanger beneficially owned 38,162 shares of the Company's common stock.

Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Schlanger owned approximately $4.88 million worth of Crown Castle stock.

26.    For the fiscal year ended December 31, 2018, Defendant Schlanger received 3,357,955 in compensation from the Company. This included $527,519 in salary, $2,167,442 in stock awards, $612,144 in non-equity incentive plan compensation, and $50,850 in all other compensation.

27.    The 2019 Proxy Statement stated the following about Defendant Schlanger:

Daniel K. Schlanger was appointed our SVP and CFO, effective June 1, 2016, after joining the Company as SVP—Finance effective April 1, 2016. In addition, Mr. Schlanger served as our Treasurer from October 23, 2017 to December 11, 2018. Mr. Schlanger previously served as SVP and CFO of Exterran GP LLC, the general partner of Exterran Partners, L.P., from June 2006 through March 2009 and as a director of Exterran GP LLC's board of directors from October 2006 through November 2015. From October 2015 to March 2016, Mr. Schlanger served as SVP of Global Products at Exterran Corporation, an oil and gas products and services company, where he was responsible for global product strategy development and implementation. From 2009 to 2015, Mr. Schlanger also served as SVP in various capacities, including marketing and operations, with Exterran Holdings, Inc. and Exterran GP LLC. Prior to working with Exterran Partners, L.P. and Exterran Corporation, Mr. Schlanger was employed as an investment banker with Merrill Lynch & Co., where he focused on mergers and acquisitions and capital markets transactions in the energy sector.

**Defendant Bartolo**

28.    Defendant P. Robert Bartolo ("Bartolo") has served as a Company director since February 2014. He is also the Chair of the Company's Audit Committee, and a member of the Compensation Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Bartolo beneficially owned 28,737 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Bartolo owned approximately $3.67 million worth of Crown Castle stock.

29.     For the fiscal year ended December 31, 2018, Defendant Bartolo received $272,339 in compensation from the Company. This included $95,000 in fees earned or paid in cash, $154,952 in stock awards, and $22,387 in all other compensation.

30.     The 2019 Proxy Statement stated the following about Defendant Bartolo:

Mr. Bartolo was appointed to the Board as a director in February 2014. Mr. Bartolo served as a portfolio manager in the U.S. Equity Division of T. Rowe Price from March 2005 to January 2014. During such time, Mr. Bartolo also served as Vice President of T. Rowe Price Group, Inc. From October 2007 to January 2014, Mr. Bartolo served as Executive Vice President ("EVP") of the U.S. Growth Stock Fund and chairman of that fund's Investment Advisory Committee. Mr. Bartolo also analyzed and recommended companies in the telecommunications and related industries for T. Rowe Price from August 2002 to March 2007 and co-managed the Media and Telecom Fund from March 2005 to March 2007. Mr. Bartolo has earned the Chartered Financial Analyst designation.

### Defendant Christy

31.     Defendant Cindy Christy ("Christy") has served as a Company director since August 2007. She is also the Chair of the Company's Compensation Committee, and a member of the Nominating & Corporate Governance Committee and the Strategy Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Christy beneficially owned 26,932 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Christy owned approximately $3.44 million worth of Crown Castle stock.

32.     For the fiscal year ended December 31, 2018, Defendant Christy received $244,952 in compensation from the Company. This included $90,000 in fees earned or paid in cash and $154,952 in stock awards.

33.     The 2019 Proxy Statement stated the following about Defendant Christy:

Ms. Christy was appointed to the Board as a director in August 2007. Ms. Christy has served as President of Asurion Corporation ("Asurion") since September 2014. Ms. Christy's prior positions at Asurion include service as Chief Operating Officer

9

("COO") from September 2014 to December 2017, as President-Americas from December 2012 to September 2014, and as President-Sales, Marketing and Product Management from November 2008 to December 2012. Prior to joining Asurion, Ms. Christy served as President, Americas Region for Alcatel-Lucent from January 2008 to September 2008 and as President of the North America Region for Alcatel-Lucent from December 2006 to December 2007. Prior to that time, Ms. Christy served in various positions with Lucent Technologies Inc., including President of the Network Solutions Group, President of the Mobility Solutions Group and COO of the Mobility Solutions Group. Ms. Christy serves on the board of directors of The Dun & Bradstreet Corporation, a publicly held company.

**Defendant Fitzgerald**

34.     Defendant Ari Q. Fitzgerald ("Fitzgerald") has served as a Company director since August 2002. He is also the Chair of the Company's Nominating & Corporate Governance Committee, and a member of the Compensation Committee and the Strategy Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Fitzgerald beneficially owned 28,462 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Fitzgerald owned approximately $3.64 million worth of Crown Castle stock.

35.     For the fiscal year ended December 31, 2018, Defendant Fitzgerald received $239,952 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $154,952 in stock awards.

36.     The 2019 Proxy Statement stated the following about Defendant Fitzgerald:

Mr. Fitzgerald was appointed to the Board as a director in August 2002. Mr. Fitzgerald is currently a partner in the Washington, D.C. office of Hogan Lovells US LLP ("Hogan Lovells"), and is a member of that firm's Communications Group where he concentrates on wireless, international and Internet-related issues. Prior to joining Hogan Lovells, Mr. Fitzgerald was an attorney with the Federal Communications Commission ("FCC") from 1997 to 2001. While at the FCC he served for nearly three years as legal advisor to FCC Chairman William Kennard and later as Deputy Chief of the FCC's International Bureau. Prior to joining the FCC, Mr. Fitzgerald was an attorney in the Office of Legal Counsel of the U.S. Department of Justice. He also served as legal counsel to former U.S. Senator Bill

Bradley. Prior to working for the U.S. Department of Justice, Mr. Fitzgerald worked as an attorney for the law firm of Sullivan & Cromwell LLP.

**Defendant Garrison**

37.     Defendant Robert E. Garrison II ("Garrison") has served as a Company director since May 2005. He is also a member of the Company's Compensation Committee and Audit Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Garrison beneficially owned 26,608 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Garrison owned approximately $3.4 million worth of Crown Castle stock.

38.     For the fiscal year ended December 31, 2018, Defendant Garrison received $254,346 in compensation from the Company. This included $80,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

39.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Garrison made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 8/29/2018 | 2,451 | $113.96 | $279,311 |

40.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

41.     The 2019 Proxy Statement stated the following about Defendant Garrison:

Mr. Garrison was elected to the Board as a director in May 2005. Mr. Garrison served as Chairman of the Executive Committee of Sanders Morris Harris Group Inc. ("SMHG"), a financial services company, from May 2009 until February 2012. Mr. Garrison served as President and CEO of SMHG from January 1999 until May 2002 and as President until May 2009. Mr. Garrison is a director of Prosperity

Bank; NuPhysicia LLC; and JTS Capital Corp, each a privately held company. He also serves as a corporate member of the board of directors of the Memorial Hermann Health System. Mr. Garrison has had prior service as a director of FirstCity Financial Corporation and SMHG (each, formerly a publicly held company). Mr. Garrison has over 40 years' experience in the securities industry and is a Chartered Financial Analyst.

### Defendant Goldsmith

42.    Defendant Andrea J. Goldsmith ("Goldsmith") has served as a Company director since February 2018. She is also a member of the Company's Nominating & Corporate Governance Committee and Strategy Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Goldsmith beneficially owned 2,977 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Goldsmith owned approximately $381,056 worth of Crown Castle stock.

43.    For the fiscal year ended December 31, 2018, Defendant Goldsmith received $229,952 in compensation from the Company. This included $75,000 in fees earned or paid in cash and $154,952 in stock awards.

44.    The 2019 Proxy Statement stated the following about Defendant Goldsmith:

Ms. Goldsmith was appointed to the Board effective February 2018. Ms. Goldsmith has served as the Stephen Harris professor in the School of Engineering at Stanford University since 2012 and has served as a professor, associate professor or assistant professor at Stanford University since January 1999. Ms. Goldsmith also founded and served as Chief Technology Officer of Plume WiFi (formerly, Accelera, Inc.) from August 2010 to August 2014 and Quantenna Communications, Inc. (formerly, mySource Communications, Inc.) from 2005 to 2009. In addition, Ms. Goldsmith currently serves on the Technical Advisory Boards of Sequans Communications and Cohere Technologies. Ms. Goldsmith is a frequent lecturer and writer regarding wireless technologies. Ms. Goldsmith also serves on the board of directors of Medtronic plc, a publicly held company.

### Defendant Hogan

45.    Defendant Lee W. Hogan ("Hogan") has served as a Company director since March 2001. He is also a member of the Company's Audit Committee, Compensation Committee, and Strategy Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Hogan beneficially owned 51,057 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Hogan owned approximately $6.53 million worth of Crown Castle stock.

46.    For the fiscal year ended December 31, 2018, Defendant Hogan received $234,952 in compensation from the Company. This included $80,000 in fees earned or paid in cash and $154,952 in stock awards.

47.    The 2019 Proxy Statement stated the following about Defendant Hogan:

Mr. Hogan was appointed to the Board as a director in March 2001. Mr. Hogan served as President and CEO of SFM Limited from March 2001 to December 2001. Mr. Hogan served as an officer and director of Reliant Energy Inc. ("Reliant"), a public diversified international energy services and energy delivery company, from 1990 to 2000. During his tenure at Reliant, Mr. Hogan served as Vice Chairman and as one of four members of The Office of the CEO, the principal management policy instrument of Reliant. In addition, he served on the Finance Committee of Reliant's board of directors. Previously, Mr. Hogan served as CEO of Reliant's Retail Energy Group, president and CEO of Reliant's International Business Group (directing energy operations in Asia, Europe and Latin America), and in a variety of capacities for Reliant's Houston Lighting & Power subsidiary. Mr. Hogan was the founding president of The Greater Houston Partnership, a business advocacy organization, where he served from 1987 to 1990.

**Defendant Hutcheson**

48.    Defendant Edward C. Hutcheson, Jr. ("Hutcheson") served as a Company director from January 1995 until February 1999, and from July 1999 to the present. He is also a member of the Company's Strategy Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Hutcheson beneficially owned 61,145 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March

29, 2019 was $128.00, Defendant Hutcheson owned approximately $7.82 million worth of Crown Castle stock.

49.     For the fiscal year ended December 31, 2018, Defendant Hutcheson received $249,346 in compensation from the Company. This included $75,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

50.     The 2019 Proxy Statement stated the following about Defendant Hutcheson:

Mr. Hutcheson has served on the Board as a director from January 1995 until February 1999 and from July 1999 until the present. Mr. Hutcheson was a co-founder of ours in 1994 and served as our CEO or Chairman from inception until March 1997. Since February 2000, Mr. Hutcheson has been involved in private investment and consulting activities. He currently serves as a Managing Director and Senior Advisor of the private equity firm Platte River Equity, LLC. From March 1997 until February 2000, he served in several capacities, including COO, with Pinnacle Global Group Inc., formerly a publicly owned financial services company, which merged to form SMHG. From 1987 through 1993, he served in senior management roles with Baroid Corporation, formerly a publicly owned petroleum services company and now a part of Halliburton Co. He served as President, COO and a director of the Baroid holding company from 1990 through 1993. Mr. Hutcheson is also a member of the Board of Trustees of Northwestern University.

**Defendant Martin**

51.     Defendant J. Landis Martin ("Martin") served as a Company director from 1995 until November 1998, and from November 1999 to the present, and has served as the Chairman of the Board since May 2002. He is also a member of the Company's Nominating & Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Martin beneficially owned 117,967 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Martin owned approximately $15 million worth of Crown Castle stock.

52.    For the fiscal year ended December 31, 2018, Defendant Martin received $329,908 in compensation from the Company. This included $75,000 in fees earned or paid in cash and $254,908 in stock awards.

53.    The 2019 Proxy Statement stated the following about Defendant Martin:

Mr. Martin has been a director on our Board from 1995 through November 1998 and from November 1999 to the present. Mr. Martin has served as Chairman of our Board since May 2002. Mr. Martin is Chairman of the private equity firm Platte River Equity, LLC and has been a Managing Director since its founding in November 2005. Mr. Martin retired as Chairman and CEO of Titanium Metals Corporation, a publicly held integrated producer of titanium metals, where he served from January 1994 until November 2005. Mr. Martin served as President and CEO of NL Industries, Inc., a publicly held chemical manufacturer, from 1987 to 2003 and as a director from 1986 to 2003. Mr. Martin is also lead director of Apartment Investment Management Company and Intrepid Potash, Inc., each a publicly held company. Mr. Martin served as a director on the board of directors of Halliburton Company, a publicly held company, from 1998 until 2018, having served as lead director from 2009 to 2018.

**Defendant McKenzie**

54.    Defendant Robert F. McKenzie ("McKenzie") has served as a Company director since 1995. He is also a member of the Company's Audit Committee and Strategy Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant McKenzie beneficially owned 31,835 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant McKenzie owned approximately $4.07 million worth of Crown Castle stock.

55.    For the fiscal year ended December 31, 2018, Defendant McKenzie received $254,346 in compensation from the Company. This included $80,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

56.    The 2019 Proxy Statement stated the following about Defendant McKenzie:

Mr. McKenzie was elected to the Board as a director in 1995. During his multi-decade career, Mr. McKenzie built and led operations of mobile wireless, voice and

data networking, computer storage, and business services companies. From 1990 to 1994, Mr. McKenzie was a founder, director and President/COO of OneComm, Inc., a mobile communications provider, which was sold to Nextel Communications (now part of Sprint Corporation) ("Nextel") in 1994. From 1980 to 1990, he held general management positions with Northern Telecom, Inc. and was responsible for the marketing and support of its Meridian Telephone Systems and Distributed Communications networks to businesses in the Western United States. In addition, as an independent investor and director, he has helped establish Vector ESP, Inc. (a private company implementing server-based computing applications), CO Space Inc. (a private computer server co-location facilities company), Velocom, Inc. (a private company providing wireless telephone and Internet services in Brazil), and Cordillera Communications Corporation (a private mobile communications provider in the U.S., Peru, Ecuador and Chile). From June 2012 to December 2015, Mr. McKenzie served on the board of directors of Mobile Pulse Inc. (a privately held mobile connectivity analytics company).

**Defendant Melone**

57.    Defendant Anthony J. Melone ("Melone") has served as a Company director since May 2015. He is also the Chair of the Company's Strategy Committee, and a member of the Nominating & Corporate Governance Committee. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Melone beneficially owned 14,667 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Melone owned approximately $1.87 million worth of Crown Castle stock.

58.    For the fiscal year ended December 31, 2018, Defendant Melone received $259,346 in compensation from the Company. This included $85,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

59.    The 2019 Proxy Statement stated the following about Defendant Melone:

Mr. Melone was appointed to the Board as a director in May 2015. Mr. Melone has over three decades of experience in the telecommunications industry, including having served as EVP and CTO for Verizon Communications from December 2010 to April 2015. In addition, Mr. Melone served in a variety of positions with Verizon Wireless from 2000 to December 2010, including as SVP and CTO from 2007 to December 2010 (Verizon Wireless accounted for approximately 20% of our 2018

consolidated revenues). Mr. Melone serves on the board of directors of ADTRAN, Inc., a publicly held company.

**Defendant Moreland**

60.    Defendant W. Benjamin Moreland ("Moreland") has served as a Company director since August 2006. Previously, he served as Executive Vice President and CFO from February 2004 to June 2008, President and CEO from July 2008 to June 2016, and Executive Vice Chairman from June 2016 to December 2017. According to the 2019 Proxy Statement, as of March 29, 2019, Defendant Moreland beneficially owned 686,501 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 29, 2019 was $128.00, Defendant Moreland owned approximately $87.8 million worth of Crown Castle stock.

61.    For the fiscal year ended December 31, 2018, Defendant Moreland received $252,339 in compensation from the Company. This included $75,000 in fees earned or paid in cash, $154,952 in stock awards, and $22,387 in all other compensation.

62.    The 2019 Proxy Statement stated the following about Defendant Moreland:

Mr. Moreland was appointed to the Board as a director in August 2006 and served as our EVC from June 2016 to December 2017. Prior to his appointment as EVC, he served as our President and CEO from July 2008 and as our EVP and CFO from February 2004 to June 2008, having been appointed CFO and Treasurer in April 2000. Prior to being appointed CFO, he had served as our SVP and Treasurer, including with respect to our domestic subsidiaries, since October 1999. Mr. Moreland serves on the board of directors of Houston Methodist Hospital. From May 2016 to September 2017, Mr. Moreland served on the board of directors of Monogram Residential Trust, Inc., which was a publicly held company until its acquisition by an affiliate of Greystar Growth and Income Fund, LP in September 2017. From January 2008 to March 2018, Mr. Moreland served on the board of directors of Calpine Corp., which was a publicly held company until its acquisition by an affiliate of Energy Capital Partners. On February 4, 2019, Clear Channel Outdoor Holdings, Inc. ("CCO"), a publicly held company, announced that it has selected Mr. Moreland to serve as the chairman on its new board of directors when CCO becomes a standalone company upon iHeartMedia, Inc.'s, CCO's indirect parent company, emergence from its previously announced restructuring process.

17

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.     By reason of their positions as officers, directors, and/or fiduciaries of Crown Castle and because of their ability to control the business and corporate affairs of Crown Castle, the Individual Defendants owed Crown Castle and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Crown Castle in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Crown Castle and its shareholders so as to benefit all shareholders equally.

64.     Each director and officer of the Company owes to Crown Castle and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Crown Castle, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66.     To discharge their duties, the officers and directors of Crown Castle were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of Crown Castle, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Crown Castle's Board at all relevant times.

68.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69.     To discharge their duties, the officers and directors of Crown Castle were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Crown Castle were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Crown Castle's own Proper Business Practices and Ethics Policy (the "Ethics Policy")

and Financial Code of Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Crown Castle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Crown Castle and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Crown Castle's operations would comply with all applicable laws and Crown Castle's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.    Each of the Individual Defendants further owed to Crown Castle and the shareholders the duty of loyalty requiring that each favor Crown Castle's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Crown Castle and were at all times acting within the course and scope of such agency.

72.    Because of their advisory, executive, managerial, and directorial positions with Crown Castle, each of the Individual Defendants had access to adverse, non-public information about the Company.

73.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Crown Castle.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange

Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Crown Castle was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and in furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Crown Castle, and was at all times acting within the course and scope of such agency.

## CROWN CASTLE'S ETHICS POLICY AND FINANCIAL CODE OF ETHICS

79.     The Company's Ethics Policy provides that "[t]he Policy applies to all employees of Crown Castle throughout the world," and that "Crown Castle employees are responsible for

reading, understanding and complying with the Policy. Each employee should make a commitment to strive to conduct Crown Castle's business with integrity and in compliance with the Policy."

80.     In a section titled, "Questionable or Improper Payments or Use of Crown Castle's Assets," the Ethics Policy states the following:

An employee should seek to protect Crown Castle's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on Crown Castle's profitability. The use of Crown Castle funds or assets for any unlawful or improper purpose is not permitted. Further, no payment on behalf of Crown Castle may be made or approved with the intention or understanding that any part of such payment is to be used for any unlawful purpose.

Crown Castle's assets should be used for legitimate business purposes and are not maintained for use by an employee for non-business related purposes. An employee's occasional personal use of items such as stationery, supplies, copying facilities or telephone, when the cost to Crown Castle is insignificant, is permissible. Each employee should consult and abide by Crown Castle's other policies and guidelines relating to the use of specific assets, such as Crown Castle's email system and automobiles.

81.     In a section titled, "Books and Records," the Ethics Policy states the following:

Crown Castle's books, records and accounts should accurately and fairly reflect the transactions of Crown Castle in reasonable detail and in accordance with Crown Castle's accounting practices and policies, including generally accepted accounting principles and Crown Castle's system of internal controls, as applicable. The following examples are given for purposes of illustration and are not intended to limit the generality of the foregoing in any way:

- No false, misleading or deliberately inaccurate books, records, accounts or entries should be made or caused to be made.
- No payment should be made with the intention or understanding that all or any part of it is to be used for any purpose other than that described by the documents supporting the payment.
- No undisclosed, unrecorded or "off-book" funds or assets should be established.
- No false or misleading statements (or omissions), written or oral, should be intentionally made to any internal or external accountant or auditor with respect to Crown Castle's financial statements or documents to be filed with the U.S. Securities and Exchange Commission ("SEC") or other governmental authority.
- No action to fraudulently influence, coerce, manipulate or mislead Crown Castle's internal or independent auditors should be made or taken.

An employee should exercise due diligence in order to comply with the standards described above. If an employee believes that Crown Castle's books and records are not being maintained in accordance with these requirements, the employee should report the matter pursuant to the reporting procedures described below.

82.    In a section titled, "Fair Dealing," the Ethics Policy states the following:

In connection with Crown Castle's business, each employee should endeavor to deal fairly with other employees and third parties. Customers and suppliers should be dealt with at arm's length and have fair opportunities to compete for Crown Castle's business. In furtherance of fair competition, an employee should seek to avoid actions that are in violation of laws and regulations governing competitive practices in the marketplace.

83.    In a section titled, "Compliance with Laws and Regulations (including Insider

Trading Laws), the Ethics Policy states the following:

Obeying the law both in letter and in spirit is the foundation upon which Crown Castle's ethical standards are built. An employee should endeavor to comply with the laws and regulations applicable to Crown Castle's business. Although an employee is not expected to know every law and regulation that is applicable to Crown Castle, it is important that employees know enough to ask questions and seek advice from supervisors, managers, lawyers or other appropriate personnel if he or she has any doubt regarding the legality of an action taken, or not taken, on behalf of Crown Castle.

In general, purchasing or selling securities of Crown Castle, either directly or indirectly, while in possession of material non-public information is both unethical and illegal. An employee may not disclose material non-public information to others who might use such information to directly or indirectly place trades in Crown Castle securities. An employee should read and comply with Crown Castle's Policy Statement on Insider Trading.

Pursuant to Section 16 of the Securities Exchange Act of 1934, substantially all purchases or sales of securities of Crown Castle by directors, executive officers, and 10% stockholders should be disclosed within two business days of the transaction. Each officer, director and stockholder who is subject to these reporting procedures should comply with such laws and regulations and the applicable provisions of Crown Castle's Policy Statement on Insider Trading.

Crown Castle endeavors to provide full, accurate, timely and understandable disclosure in all public communications and reports and documents that Crown Castle files with the SEC.

84.    The Company also maintains a Financial Code of Ethics, which applies to the Company's CEO and CFO, among other executive officers. The Financial Code of Ethics provides that the Company's senior officers must:

- act ethically with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission ("SEC") and in other public communications that the Company makes;
- comply with applicable laws, rules and regulations of national, state, provincial and local governments and private and public regulatory agencies (including the New York Stock Exchange ("NYSE")) having jurisdiction over the Company;
- act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing his or her independent judgment on behalf of the Company to be subordinated to other interests;
- promote honest and ethical behavior by others in the work environment;
- respect the confidentiality of information acquired in the course of his or her work except when authorized or otherwise legally obligated to disclose such information;
- responsibly use and maintain all assets and resources employed or entrusted to such Senior Officer;
- promptly report material violations of this Financial Code pursuant to the "Compliance Procedures" below; and
- accept accountability for adherence to this Financial Code.

85.    In violation of the Ethics Policy, as well as the Financial Code of Ethics with respect to Defendants Brown and Schlanger, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, one of the Individual Defendants violated the Ethics Policy by engaging in insider trading. Also in violation of the Ethics Policy, as well as the Financial Code of Ethics with respect

to Defendants Brown and Schlanger, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Ethics Policy and Financial Code of Ethics.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

86.    Crown Castle is a Texas-based REIT specializing in communications infrastructure. The Company owns, operates, and leases cell towers, fiber assets, and other infrastructure. Crown Castle is the largest provider of shared communications infrastructure in the United States.

87.    The Company's operating segments consist of its Towers segment and its Fiber segment, which manage approximately 40,000 cell towers and over 65,000 miles of fiber optic cable, respectively. A significant majority of the Company's services revenue is generated by the Company's Towers segment, and includes revenue generated through cell tower installation services.

88.    During the Relevant Period, the Individual Defendants caused the Company to record in its financial statements the entirety of the transaction price from cell tower installation services as revenue upon the completion of such services. However, portions of the transaction price of these services constituted modifications to leases related to the installation services. As such, those portions of the revenue should have been recorded on a ratable basis, and recognized cumulatively over the term of the lease contracts, rather than all at once.

89.    As the Company later admitted in its press release issued on February 26, 2020, this practice was not acceptable under GAAP. As a result, the Company's adjusted EBITDA,

adjusted funds from operations, and net income were each inflated by at least $100 million during the Relevant Period.

90.     On October 16, 2019, the Company issued a press release disclosing that in September 2019, the Company had received a subpoena from the SEC requesting documents from 2015 through 2019 "primarily related to the Company's long-standing capitalization and expense policies for tenant upgrades and installations in its services business." The press release stated that the Company was "cooperating fully with the SEC's investigation."

91.     As revealed in the Company's press release issued on February 26, 2020, following the SEC's subpoena, representatives of Crown Castle and PricewaterhouseCoopers LLP, the Company's independent auditor, met with the OCA to discuss the Company's accounting practices. Ultimately, the Company and the OCA concluded that the Company's revenue recognition practices with respect to services revenues violated GAAP, and as a result, there existed a material weakness in the Company's internal controls.

### False and Misleading Statements

#### *February 26, 2018 Form 10-K*

92.     On February 26, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Brown, Schlanger, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

93.    For the fiscal year ended December 31, 2017, the 2017 10-K reported $444,550,000 in net income, and an adjusted EBITDA of $2,481,761,000.

94.    With respect to the Company's internal controls, the 2017 10-K stated the following, in relevant part:

> In connection with the preparation of this Annual Report on Form 10-K, as of December 31, 2017, the Company's management conducted an evaluation, under the supervision and with the participation of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act")). ***Based upon their evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures, as of December 31, 2017, were effective*** to provide reasonable assurance that information required to be disclosed by the Company in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and to provide reasonable assurance that information required to be disclosed by the Company in such reports is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.
>
> \* \* \*
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for the Company. Under the supervision and with the participation of the Company's CEO and CFO, management assessed the effectiveness of the Company's internal control over financial reporting based on the framework described in *"Internal Control – Integrated Framework (2013),"* issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***
>
> \* \* \*
>
> Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. ***Based on the Company's assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2017 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.***

* * *

> There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

(Emphasis added.)

### *April 2, 2018 Proxy Statement*

95.     On April 10, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

96.     With respect to the Company's Ethics Policy and Financial Code of Ethics, the 2018 Proxy Statement stated, "[c]opies of the Committee charters of each of the Audit Committee, Compensation Committee and the NCG Committee, together with certain other corporate governance materials, including our Financial Code of Ethics, Corporate Governance Guidelines and Business Practices and Ethics Policy, can be found under the Investors section of our website."

97.     The 2018 Proxy Statement was false and misleading because the Ethics Policy and the Financial Code of Ethics were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Ethics Policy or the Financial Code of Ethics.

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

98.     The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain services revenues in its financial statements, in violation of GAAP; (2) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (3) as a result of the foregoing, the Company would be subject to increased scrutiny from the SEC, culminating in an investigation, the need to restate certain of the Company's financial statements, and other damages to the Company; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, Crown Castle's public statements were materially false and misleading at all relevant times.

### *May 4, 2018 Form 10-Q*

99.     On May 4, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendant Schlanger, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 1Q18 10-Q.

100.     For the fiscal quarter ended March 31, 2018, the 1Q18 10-Q reported $114,000,000 in net income (loss), and an adjusted EBITDA of $763,000,000.

101.     With respect to the Company's internal controls, the 1Q18 10-Q stated the following, in relevant part:

> The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

* * *

There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis added.)

### *August 6, 2018 Form 10-Q*

102.    On August 6, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 with the SEC (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendant Schlanger, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 2Q18 10-Q.

103.    With respect to the Company's net income and adjusted EBITDA, the 2Q18 10-Q stated the following, in relevant part:

Net income (loss) attributable to CCIC stockholders was income of $180 million during the second quarter of 2018 compared to income of $112 million during the second quarter of 2017. ***The increase was predominately related to net growth in our Towers and Fiber segments***, including as a result of the Wilcon Acquisition and Lightower Acquisition as discussed above, partially offset by an increase in expenses, including increases in (1) interest expense and amortization of deferred financing costs, (2) depreciation, amortization, and accretion, and (3) general and administrative expenses.

Adjusted EBITDA increased $180 million, or 31%, from the second quarter of 2017 to the second quarter of 2018. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***, including the Wilcon Acquisition and Lightower Acquisition.

(Emphasis added.)

104.    With respect to the Company's internal controls, the 2Q18 10-Q stated the following, in relevant part:

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief***

*Financial Officer concluded that the Company's disclosure controls and procedures were effective* in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

\* \* \*

There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis added.)

### November 5, 2018 Form 10-Q

105.    On November 5, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendant Schlanger, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 3Q18 10-Q.

106.    With respect to the Company's net income and adjusted EBITDA, the 3Q18 10-Q stated the following, in relevant part:

Net income (loss) attributable to CCIC stockholders was income of $164 million during the third quarter of 2018 compared to income of $115 million during the third quarter of 2017. *The increase was predominately related to net growth in our Towers and Fiber segments*, including as a result of the Lightower Acquisition as discussed above, partially offset by an increase in expenses, including increases in (1) depreciation, amortization, and accretion, (2) selling, general and administrative expenses and (3) losses on retirement of long-term obligations.

Adjusted EBITDA increased $188 million, or 31%, from the third quarter of 2017 to the third quarter of 2018. *Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments*, including the Lightower Acquisition.

(Emphasis added.)

107.    With respect to the Company's internal controls, the 3Q18 10-Q stated the following, in relevant part:

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

\* \* \*

There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

(Emphasis added.)

### *February 25, 2019 Form 10-K*

108.    On February 25, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants Brown, Schlanger, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 2018 10-K.

109.    For the fiscal year ended December 31, 2018, the 2018 10-K reported $671,000,000 in net income, and an adjusted EBITDA of $3,141,000,000.

110.    With respect to the Company's internal controls, the 2018 10-K stated the following, in relevant part:

In connection with the preparation of this Annual Report on Form 10-K, as of December 31, 2018, the Company's management conducted an evaluation, under the supervision and with the participation of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act")). ***Based upon their evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures, as of December 31, 2018, were effective*** to

provide reasonable assurance that information required to be disclosed by the Company in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and to provide reasonable assurance that information required to be disclosed by the Company in such reports is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

* * *

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for the Company. Under the supervision and with the participation of the Company's CEO and CFO, management assessed the effectiveness of the Company's internal control over financial reporting based on the framework described in *"Internal Control – Integrated Framework (2013),"* issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***

* * *

Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. ***Based on the Company's assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2018 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.***

* * *

There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.

(Emphasis added.)

### April 1, 2019 Proxy Statement

111.    On April 1, 2019, the Company filed the 2019 Proxy Statement with the SEC.

Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin,

McKenzie, Melone, and Moreland solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

112.    With respect to the Company's Ethics Policy and Financial Code of Ethics, the 2019 Proxy Statement stated, "[c]opies of the Committee charters of each of the Audit Committee, Compensation Committee and the NCG Committee, together with certain other corporate governance materials, including our Financial Code of Ethics, Corporate Governance Guidelines and Business Practices and Ethics Policy, can be found under the Investors section of our website."

113.    The 2019 Proxy Statement was false and misleading because the Ethics Policy and the Financial Code of Ethics were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Ethics Policy or the Financial Code of Ethics.

114.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain services revenues in its financial statements, in violation of GAAP; (2) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (3) as a result of the foregoing, the Company would be subject to increased scrutiny from the SEC, culminating in an investigation, the need to restate certain of the Company's financial statements, and other damages to the Company; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, Crown Castle's public statements were materially false and misleading at all relevant times.

***May 3, 2019 Form 10-Q***

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

115.    On May 3, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Schlanger, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 1Q19 10-Q.

116.    With respect to the Company's net income and adjusted EBITDA, the 1Q19 10-Q stated the following, in relevant part:

> Net income (loss) attributable to CCIC stockholders was income of $210 million during the first quarter of 2019 compared to income of $114 million during the first quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments*** and a decrease in losses on retirement of long-term obligations, partially offset by an increase in expenses, including increases in depreciation, amortization, and accretion and selling, general and administrative expenses.
>
> Adjusted EBITDA increased $58 million, or 8%, from the first quarter of 2018 to the first quarter of 2019. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***.

(Emphasis added.)

117.    With respect to the Company's internal controls, the 1Q19 10-Q stated the following, in relevant part:

> The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.
>
> * * *
>
> There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have updated our existing information

technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019.

(Emphasis added.)

### *July 31, 2019 Form 10-Q*

118.    On July 31, 2019, Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Schlanger, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 2Q19 10-Q.

119.    With respect to the Company's net income and adjusted EBITDA, the 2Q19 10-Q stated the following, in relevant part:

> Net income (loss) attributable to CCIC stockholders was income of $246 million during the second quarter of 2019 compared to income of $180 million during the second quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments***, partially offset by an increase in expenses, including increases in (1) selling, general and administrative expenses, (2) depreciation, amortization and accretion, and (3) interest expense and amortization of deferred financing costs.
>
> Adjusted EBITDA increased $88 million, or 11%, from the second quarter of 2018 to the second quarter of 2019. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***.

(Emphasis added.)

120.    With respect to the Company's internal controls, the 2Q19 10-Q stated the following, in relevant part:

> The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

* * *

> There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019.

(Emphasis added.)

### *October 16, 2019 Press Release*

121.    On October 16, 2019, the Company issued a press release announcing the Company's financial results for the fiscal quarter ended September 30, 2019. The press release reported $1,128,000,000 in net income, $3,592,000,000 in adjusted EBITDA, $5,219,000,000 in site rental revenues, and $2,685,000,000 in adjusted funds from operations.

### *October 16, 2019 Supplemental Information Package and Non-GAAP Reconciliations*

122.    Also on October 16, 2019, the Company issued a "Supplemental Information Package and Non-GAAP Reconciliations" for the fiscal quarter ended September 30, 2019 (the "3Q19 Information Package"), which was attached as an exhibit to a current report on Form 8-K filed with the SEC.

123.    The 3Q19 Information Package reported $646,000,000 in adjusted funds from operations for the three months ended September 30, 2019, and $1,871,000,000 in adjusted funds from operations for the nine months ended September 30, 2019.

124.    The 3Q19 Information Package also reported $579,000,000 in adjusted funds from operations for the three months ended September 30, 2018, and $1,683,000,000 in adjusted funds from operations for the nine months ended September 30, 2018.

### *November 4, 2019 Form 10-Q*

125.    On November 4, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 with the SEC (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Schlanger, and contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the 3Q19 10-Q.

126.    With respect to the Company's net income and adjusted EBITDA, the 3Q19 10-Q stated the following, in relevant part:

> Net income attributable to CCIC stockholders was $244 million during the third quarter of 2019 compared to $136 million during the third quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments*** and a decrease in losses on retirement of long-term obligations, partially offset by an increase in interest expense and amortization of deferred financing costs.

> Adjusted EBITDA increased $89 million, or 11%, from the third quarter of 2018 to the third quarter of 2019. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***.

(Emphasis added.)

127.    With respect to the Company's internal controls, the 3Q19 10-Q stated the following, in relevant part:

> The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

> * * *

> There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019.

(Emphasis added.)

128.    The statements referenced in ¶¶ 92–94, 99–110, and 115–127 herein were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain services revenues in its financial statements, in violation of GAAP; (2) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (3) as a result of the foregoing, the Company would be subject to increased scrutiny from the SEC, culminating in an investigation, the need to restate certain of the Company's financial statements, and other damages to the Company; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, Crown Castle's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

*February 26, 2020 Press Release*

129.    On February 26, 2020, the Company issued a press release announcing that the Company and the OCA had determined that certain of the Company's revenue recognition practices were unacceptable under GAAP, and therefore, the Company would be required to restate its financial statements for the fiscal years ended December 31, 2018 and December 31, 2017, as well as its quarterly financial statements issued during 2018 and 2019. The press release stated the following, in relevant part:

> Our long-standing historical practice with respect to services revenues had been to recognize the entirety of the transaction price from our tower installation services as services revenues upon the completion of the installation services. ***After consultation with the OCA, we concluded that our historical practice was not acceptable under GAAP***.  Instead, a portion of the transaction price for our installation services, specifically the amounts associated with permanent improvements recorded as fixed assets, represents a modification to the leases to which the services work is related and, therefore, should be recognized on a ratable basis as site rental revenues over the associated estimated remaining lease

term. Cumulatively, over the term of customer lease contracts, we will recognize the same amount of total revenue and total gross margin as our historical practice.

The result of recognizing a portion of the transaction price on a ratable basis will be an increase to site rental revenues and site rental gross margins that offsets, over time, the decreases to services revenues and services gross margins, in both historical and future periods. *As a result, the preliminary impact to each of Net Income, Adjusted EBITDA and AFFO is a decrease of approximately $100 million for full year 2019 actuals and a decrease of approximately $90 million to our Previous 2020 Outlook*. We have provided tables in this release to reconcile the changes. Recognizing a portion of the transaction price on a ratable basis for tower installation services will have no impact on our net cash flows, business operations or expected dividend per share growth.

*Due to the identified errors described above, we will restate our financial statements for the years ended December 31, 2018 and 2017, and unaudited financial information for the quarterly and year-to-date periods in the year ended December 31, 2018 and for the first three quarters in the year ended December 31, 2019*. Restated financial statements and financial information for the periods in question will be reflected in Crown Castle's Annual Report on Form 10-K for the year ended December 31, 2019 ("2019 10-K"), which Crown Castle expects to file within the prescribed timeline for such report, including any available extension if needed to finalize the consolidated financial statements and disclosures and complete the associated audit work.

* * *

*Crown Castle has determined that the restatement of its previously issued financial statements as described above indicates the existence of one or more material weaknesses in its internal control over financial reporting and that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2019*. Crown Castle will report the material weakness(es) in its 2019 10-K and intends to create a plan of remediation to address the material weakness(es).

(Emphasis added.)

130.    On this news, the price of the Company's stock fell from $162.69 per share at the close of trading on February 26, 2020, to $148.40 per share at the close of trading on February 27, 2020, a drop of over 8.8%.

131.    Shortly afterward, on March 2, 2020, the Company filed with the SEC a notification of late filing on Form 12b-25 (the "March 2020 Form 12b-25"). The March 2020 Form 12b-25

disclosed that as a result of the material weakness in the Company's internal controls, the Company would be unable to timely file its 2019 10-K. The March 2020 Form 12b-25 indicated that the Company expected that it would file the 2019 10-K "within the fifteen day extension period" allotted to rectify late filings under SEC rules.

## DAMAGES TO CROWN CASTLE

132.    As a direct and proximate result of the Individual Defendants' misconduct, Crown Castle has lost and will continue to lose and expend many millions of dollars.

133.    Such expenditures include, but are not limited to, fees associated with the SEC investigation into the Company, legal fees associated with the Securities Class Action filed against the Company and the Company's CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

134.    Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

135.    As a direct and proximate result of the Individual Defendants' conduct, Crown Castle has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

136.    Plaintiff brings this action derivatively and for the benefit of Crown Castle to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Crown Castle, gross mismanagement, abuse of

control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

137.    Crown Castle is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138.    Plaintiff is, and has been at all relevant times, a shareholder of Crown Castle. Plaintiff will adequately and fairly represent the interests of Crown Castle in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

139.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

140.    A pre-suit demand on the Board of Crown Castle is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following twelve individuals: Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors who are on the Board at the time this action is commenced.

141.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices and to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of approximately $279,311, which renders them unable to

impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

142.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls, and to fail to timely file the Company's 2019 10-K. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

143.    Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as the Company's CEO and President since June 2016, and previously served as the Company's Senior Vice President, CFO, and Treasurer from July 2008 to May 2016. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Brown with his principal occupation, and he receives handsome compensation, including $9,025,526 in 2018 for his services. Defendant Brown was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings and press releases referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Brown is a defendant in the Securities Class Action. For these reasons, Defendant Brown breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Bartolo is futile follow. Defendant Bartolo has served as a Company director since February 2014. He is also the Chair of the Company's Audit Committee, and a member of the Compensation Committee. Defendant Bartolo receives handsome compensation, including $272,339 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bartolo signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Bartolo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Christy is futile follow. Defendant Christy has served as a Company director since August 2007. She is also the Chair of the Company's Compensation Committee, and a member of the Nominating & Corporate Governance Committee and the Strategy Committee. Defendant Christy receives handsome compensation, including $244,952 in 2018 for her services. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Christy signed, and thus personally made the

false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Christy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Fitzgerald is futile follow. Defendant Fitzgerald has served as a Company director since August 2002. He is also the Chair of the Company's Nominating & Corporate Governance Committee, and a member of the Compensation Committee and the Strategy Committee. Defendant Fitzgerald receives handsome compensation, including $239,952 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Fitzgerald signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Fitzgerald breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Garrison is futile follow. Defendant Garrison has served as a Company director since May 2005. He is also a member of the Company's Compensation Committee and Audit Committee. Defendant Garrison receives handsome compensation, including $254,346 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded at least $279,311

in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Garrison signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Garrison breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Goldsmith is futile follow. Defendant Goldsmith has served as a Company director since February 2018. She is also a member of the Company's Nominating & Corporate Governance Committee and Strategy Committee. Defendant Goldsmith receives handsome compensation, including $229,952 in 2018 for her services. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Goldsmith signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Goldsmith breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Hogan is futile follow. Defendant Hogan has served as a Company director since March 2001. He is also a member of the Company's Audit Committee, Compensation Committee, and Strategy Committee. Defendant Hogan receives handsome compensation, including $234,952 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hogan signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Hogan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Hutcheson is futile follow. Defendant Hutcheson served as a Company director from January 1995 until February 1999, and from July 1999 to the present. He is also a member of the Company's Strategy Committee. Defendant Hutcheson receives handsome compensation, including $249,346 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hutcheson signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Hutcheson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Martin is futile follow. Defendant Martin served as a Company director from 1995 until November 1998, and from November 1999 to the present, and has served as the Chairman of the Board since May 2002. Defendant Martin receives handsome compensation, including $329,908 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to

engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Martin signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Martin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant McKenzie is futile follow. Defendant McKenzie has served as a Company director since 1995. He is also a member of the Company's Audit Committee and Strategy Committee. Defendant McKenzie receives handsome compensation, including $254,346 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKenzie signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant McKenzie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Melone is futile follow. Defendant Melone has served as a Company director since May 2015. He is also the Chair of the Company's Strategy Committee, and a member of the Nominating & Corporate Governance Committee. Defendant Melone receives handsome compensation, including $259,346 in 2018 for his services.

As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Melone signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Melone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Moreland is futile follow. Defendant Moreland has served as a Company director since August 2006. Previously, he served as Executive Vice President and CFO from February 2004 to June 2008, President and CEO from July 2008 to June 2016, and Executive Vice Chairman from June 2016 to December 2017. Defendant Melone receives handsome compensation, including $252,339 in 2018 for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Moreland signed, and thus personally made the false and misleading statements in the 2017 and 2018 10-Ks. For these reasons, Defendant Moreland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on the Board is futile follow.

156. The Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Martin currently serves as Managing Director and Chairman of Platte River Equity, LLC, a private equity firm, where Defendant Hutcheson also serves as a Managing Director. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

157. Defendants Bartolo, Garrison, Hogan, and McKenzie (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

158. In violation of the Ethics Policy, as well as the Financial Code of Ethics with respect to Defendant Brown, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation

of the Ethics Policy, as well as the Financial Code of Ethics with respect to Defendant Brown, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Ethics Policy and the Financial Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

159.    Crown Castle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Crown Castle any part of the damages Crown Castle suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

160.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.    The acts complained of herein constitute violations of fiduciary duties owed by Crown Castle's officers and directors, and these acts are incapable of ratification.

162.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Crown Castle. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Crown Castle, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

163.    If there is no directors' and officers' liability insurance, then the Directors will not cause Crown Castle to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

164.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The

Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

167.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

168.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

169.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: that: (1) the Company improperly recognized certain services revenues in its financial statements, in violation of GAAP; (2) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (3) as a result of the foregoing, the Company would be subject to increased scrutiny from the SEC, culminating in an investigation, the need to restate certain of the Company's financial statements, and other damages to the Company; and (4) the Company failed

to maintain internal controls.  As a result of the foregoing, Crown Castle's public statements were materially false and misleading at all relevant times.

170.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Ethics Policy and the Financial Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

171.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, appointment of an independent auditor, and an advisory vote on executive compensation.

172.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland, which allowed them to continue breaching their fiduciary duties to Crown Castle.

173.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

174.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Crown Castle's business and affairs.

177.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Crown Castle.

179.    In breach of their fiduciary duties owed to Crown Castle, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain services revenues in its financial statements, in violation of GAAP; (2) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (3) as a result of the foregoing, the Company would be subject to increased scrutiny from the SEC, culminating in an investigation, the need to restate certain of the Company's financial statements, and other damages to the Company; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, Crown Castle's public statements were materially false and misleading at all relevant times.

180.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while one of the Individual Defendants made a lucrative insider sale, netting proceeds of over $279,311, which renders them personally liable to the Company for breaching their fiduciary duties.

181.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls, and to fail to timely file the Company's 2019 10-K.

182.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Crown Castle's securities.

183.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Crown Castle's

securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

184.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Crown Castle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

186.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## <u>THIRD CLAIM</u>

### Against Individual Defendants for Unjust Enrichment

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Crown Castle.

189.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Crown Castle that was tied to the performance or artificially inflated valuation of Crown Castle, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

190.    Plaintiff, as a shareholder and a representative of Crown Castle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

191.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

192.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Crown Castle, for which they are legally responsible.

194.    As a direct and proximate result of the Individual Defendants' abuse of control, Crown Castle has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Crown Castle in a manner consistent with the operations of a publicly-held corporation.

198.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Crown Castle has sustained and will continue to sustain significant damages.

199.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    The Individual Defendants caused the Company to pay themselves excessive salaries and fees, to the detriment of the shareholders and the Company.

203.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Crown Castle to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

204.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

205.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Crown Castle, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Crown Castle;

(c)    Determining and awarding to Crown Castle the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Crown Castle and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Crown Castle and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Crown Castle to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Crown Castle restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: May 26, 2020

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue
40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No.
5165) 919 N. Market St., 12th
Floor Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*